Jeffrey D. Dermer (SBN 229903)
DERMER BEHRENDT
13101 Washington Blvd., Suite 407
Los Angeles, CA 90066
(310) 266-1075 / Facsimile: (310) 954-9206
jeff@dermerbehrendt.com

Attorney for Relator Plaintiff **SPOHN RANCH, INC.**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, THE STATES OF CALIFORNIA, DELAWARE, NEVADA, NEW YORK, and TENNESSEE, and the COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA ex rel. Spohn Ranch, Inc., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN RAMP COMPANY, INC., a Missouri Corporation, Nathan Bemo, an individual, SchuBemo Holdings, Inc., a Missouri Corporation, and DOES 1-10,<br><br>Defendants. | Case No. 2:10-cv-09785-DSF (AGRx)<br><br>Assigned to Hon. Dale S. Fischer<br><br>**DECLARATION OF JEFFREY D. DERMER IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT**<br><br>[*Filed concurrently with Joint Motion for Approval of Settlement; Declaration of Jessica A. Thompson; Supporting Exhibits; and, [PROPOSED] Order*]<br><br>Hearing Date : April 16, 2018<br>Time         : 1:30 p.m.<br>Courtroom    : 7D |

I, Jeffrey D. Dermer, declare as follows,

1. I am an attorney licensed to practice law in the State of California and am admitted to the United States District Court, Central District of California. I am a Partner with the firm of Dermer Behrendt, counsel of record for Relator-Plaintiff Spohn Ranch, Inc. ("Spohn") in this action.

2. I have personal knowledge of the facts set forth herein and if called up on as a witness could competently testify thereto.

3. This declaration is submitted in support of Spohn Ranch and Defendants' Joint Motion for Approval of Settlement.

4. For the reasons set forth below, Spohn believes the settlement is fair, adequate and reasonable, and recommends the court approve the settlement accordingly.

## THE SETTLEMENT

5. The Settlement is the result of arm's length negotiation between Spohn Ranch and Defendants, after more than four (4) years of contentious litigation and extensive discovery, several days of in-person meetings, and months of subsequent negotiations regarding the terms and conditions of settlement with the assistance of counsel.[1]

6. Briefly, the Parties originally reached a settlement back in 2015, but were unable to obtain governmental approval. The government's objection was primarily threefold: (1) the amount of settlement was too low in comparison to the alleged damages; (2) the dismissal of the government's claims with prejudice; and, (3) the scope of the government's release of Defendants was purportedly too broad. Unable to obtain governmental consent, but no longer seeking to litigate, the Parties moved for court approval under applicable Ninth Circuit case law. The Court ultimately denied the motion.

7. In light of the Court's and Real Parties' objections to the prior/original settlement agreement, the parties revised the agreement and entered into a new settlement agreement ("the Settlement Agreement") to the satisfaction of the Real Parties.

8. Briefly the material terms of the Settlement Agreement are:

    a. Dismissal of Relator Spohn Ranch, Inc., claims against Defendants with prejudice;

---

[1] A true and correct copy of the Settlement Agreement between Spohn Ranch and Defendants is attached as "Exhibit A" to the concurrently filed Declaration of Jessica A. Thompson.

    b. Full and mutual releases between Defendants and Spohn Ranch relating to the subject matter of this action;

    c. There is no financial component to the proposed settlement, rather the Parties will "walk away" from the litigation;

    d. The Real Parties' claims will be dismissed without prejudice, and consequently, they retain whatever rights they may have against Defendants; and

    e. The Real Parties provide no specific release of Defendants.

## PROCEDURAL HISTORY

9. On December 20, 2010, Spohn Ranch filed the at issue *qui tam* complaint in the United States District Court for the Central District of California, captioned *United States, ex rel. Spohn Ranch, Inc. vs. American Ramp Company, Inc., et al.* Case No. 10-cv-09785 DSF (AGRx), alleging Defendants violated the federal False Claims Act ("FCA") and the false claims acts of California, Delaware, Nevada, New York, Tennessee, and the commonwealths of Massachusetts and Virginia. (See Docket Entry No. 1). In accordance with the FCA (and comparable provisions of the state FCAs) my office thereafter served the government and seven states/commonwealths with the complaint and required written disclosure of material evidence prior to filing.

10. During the period the case was under seal, Spohn and its counsel met and conferred with those investigative agencies interested including the FBI. Information requested was provided that supplemented the information provided prior to filing.

11. On or about February 15, 2011, the California Attorney General requested an extension of the seal period, ultimately declining to intervene on or about May 24, 2011. (See Docket Entry Nos. 4 – 7, 11).

12. Over the year following filing of the complaint, the Department of Justice sought two separate extensions of the seal period. (See Docket Entry

Nos. 8, 9, 13, 14). On or about January 27, 2012, the United States filed a declination to intervene, and the case was subsequently unsealed on or about January 30, 2012. (See Docket Entry Nos. 16, 18). The Commonwealth of Massachusetts declined to intervene on January 30, 2012 (See Docket Entry No. 17).

13. On February 3, 2012, Spohn filed its First Amended Complaint ("FAC"), the material allegations of which are the same as those in the original complaint. Generally, the FAC sets forth *qui tam* claims of the United States, the states of California, Delaware, Nevada, New York, Tennessee, the commonwealths of Massachusetts and Virginia, and more specifically the 76 entities identified on Exhibit 1 thereto that allegedly purchased Pro Series equipment between 2004 – 2010 (collectively "the Real Parties").[2]

14. On or about April 10, 2012 and March 8, 2013, Virginia and Tennessee filed declinations to intervene. (See Docket Entry Nos. 30, 39). On information and belief, and based on the court's docket, none of the remaining Real Parties – Delaware, Nevada, or New York – acknowledged the action, having filed neither declinations nor notices of intent to intervene.

15. Once unsealed after fourteen months under seal, Spohn moved forward prosecuting this action as a non-intervened *qui tam* matter. And, in February 2012 my office provided further notice to the municipal Real Parties of the pendency and status of the action.

**STATUS OF THE LITIGATION & SPOHN'S INVESTIGATION OF THE CLAIMS INDICATE SETTLEMENT IS APPROPRIATE**

16. Spohn – a designer and provider of various types of skateparks – began its investigation into the claims nearly two years before filing the action.

---

[2] While Exhibit 1 to the FAC identifies 80 Real Parties, there are only 76 potentially at issue in that Misawa was inadvertently listed twice, ARC has no records of a skatepark in Crystal City – listed under the Federal and Virginia claims – and Hardwick, MA was entirely privately funded.

In early 2009, as part of its own product development, Spohn conducted extensive research into ARC's Pro Series product line and sales including: (1) reverse engineering certain Pro Series equipment; (2) performing site inspections of hundreds of skateparks throughout the continental United States; (3) issuing Freedom of Information Act and Public Record Act requests to more than 40 different entities/Real Parties; and, (4) interviewing more than 20 witnesses, such as former ARC employees, ARC customers, and a third-party engineer previously hired by ARC. Spohn continued its investigation while the action remained under seal.

17. During formal discovery, Spohn: (1) analyzed the 36,000+ pages of documents Defendants produced related to the Real Party projects, ARC's Pro Series marketing materials (including the Specifications, Skateparks 101, and catalogues), and Defendants' Pro Series product development – all with the assistance of retained experts; (2) propounded 230+ interrogatories and 690 requests for admission on Defendants regarding the Real Party projects and Pro Series product line; and, (3) subpoenaed countless records from entities such as the National Joint Powers Allegiance, GSA, United States Department of Urban Development, and third party sales agencies involved in some Real Party projects.

18. Spohn also answered approximately 1,000 interrogatories and requests for admission Defendants propounded regarding Spohn's allegations, and – more specifically – Spohn's supporting evidence for each Real Party project. Responding to this discovery required a thorough analysis of the claims on a park-by-park basis.

19. At the time the parties reached a settlement in principle, they were on the verge of embarking on a lengthy deposition phase including: Spohn's 200+ category Rule 30b(6) deposition of ARC, at least 35 depositions of Spohn and ARC affiliated witnesses (in California and Missouri), between 50 – 80

depositions of Real Parties across the county, and roughly 8 – 12 separate third-party depositions. Follow up written discovery and expert witness disclosure/discovery also remained.

20. Through all the above identified investigation and discovery, Spohn has had an opportunity to evaluate the claims it pled against Defendants and to determine appropriate parameters for settlement of those claims with Defendants. And, as a long-time competitor of ARC – having in fact competed with ARC on some of the Real Party projects – is uniquely situated to understand the intricacies of the skatepark industry as it relates to the claims asserted in this action.

## THE COMPLEXITIES, EXPENSE AND RISKS MOVING FORWARD DEMONSTRATE SETTLEMENT IS PROPER

21. Proving up the required elements for each Real Party project is exceedingly complex because it entails 76 separate mini-trials.

22. Detailed analysis of the information obtained through discovery (formal and informal) revealed the majority of available evidence supporting many of Spohn's allegations is circumstantial, and the specifics of each Real Party project differed more than initially anticipated. The records maintained by the Real Parties – who are in the best position to have the information and evidence supporting these false claims – are incomplete. For example: (1) information regarding what marketing materials the Real Party received and therefore what representations were made prior to purchasing Pro Series equipment is missing; (2) some Real Parties have no record of the source of the funds used to purchase the Pro Series equipment; and, (3) other Real Parties have no information (or incomplete information) regarding the contracting method they used to purchase Pro Series equipment.

23. Because of the lack of documentary evidence supporting each Real Party project, Spohn will need to obtain and rely on the testimony of each of the

76+ Real Party representatives who made the purchasing decision. Determining the appropriate Real Party representative is complicated by the passage of time, fading memories, and the Real Party's missing contemporaneous documentation of who made the actual purchasing decision. Or, in the alternative, Spohn would have to rely on expert testimony to establish what probably occurred.

24. While Spohn maintains it could successfully prosecute the action, the benefits and finality of settlement outweigh the costs, duration, and risks moving forward.

25. Absent settlement, Spohn would at a minimum need to participate in approximately 125 fact depositions (some by written questions), take its 200+ category Rule 30b(6) deposition of ARC, and conduct expert discovery for five to eight different expert witness.

26. And, before getting to trial, Spohn would need to defeat Defendants' planned Partial Motions for Summary Judgment, including: (1) challenging certain claims as time barred under the applicable FCA for statute of limitations reasons and/or because the claim precludes enactment of the applicable FCA; (2) challenging certain claims as not actionable under the applicable FCA because there is no evidence that federal, state, commonwealth, and/or municipal funds were used to purchase Pro Series equipment; (3) challenging certain claims in that they pre-date publication of the "loads" and/or any version of the Specifications that included information regarding the "loads"; (4) challenging certain claims where the Real Party initiated contact without and prior "statements" or "representations" by ARC, and ordered directly via purchase order; and, (5) challenging certain claims where there is no evidence any alleged false statement was made to the Real Party. This is in addition to the other various defenses Defendants have asserted.

27. To the extent claims survived Defendants' dispositive motions (the likelihood of which is unknown) trial would be a logistical, exceedingly costly,

and unpredictable endeavor. It could involve the trial of 76 different claims, with testimony (and coordination) of at least 100 different witnesses from across the county. Trial would last for months and the possibility of juror confusion because of the factual differences with each Real Party's project is high.

28. Should Spohn prevail in establishing its claims, significant motion practice is anticipated on the appropriate measure of damages as Defendants dispute any knowing violation and that the entire contract amount for each Real Party project is recoverable (and/or subject to the 3x multiplier).

29. Extensive post-trial motions and appeals are inevitable regardless of which party prevails. Assuming Spohn ultimately prevailed, it would thereafter need to initiate collection proceedings the success of which is entirely speculative. Based on Spohn's analysis, Defendants cannot withstand a judgment on even 10% of the claims making bankruptcy proceedings a likely end result.

30. To date, Spohn has incurred at least $550,000 in costs investigating and prosecuting the action. Completing the necessary discovery, defending against Defendants' motions, and getting through trial will cost and unknown but significant amount that Spohn does not wish to incur. There does not appear to be any mutually agreeable settlement amount that would receive the blessing of the Real Parties in exchange for their rights. Consequently, Spohn is best served to obtain a walk away from the Defendants – having obtained the non-monetary changes in Defendants' behavior that were the impetus for the suit in the first instance.

31. Recoverability of a judgment is unlikely given Spohn does not believe Defendants have sufficient liquid assets to sustain a judgment, and understands they have exhausted all available insurance proceeds. Assuming Defendants did not declare bankruptcy, it could take years to collect a judgment, and the ultimate recovery to each Real Party would likely be less than what they

receive under the current settlement.

32. Additionally, Spohn has observed that ARC has altered its business practices to resolve the issues that Spohn believes gives rise to liability. Spohn has also observed that market participants have become more aware of the issues at the heart of the action. The litigation has served a positive purpose in the skateboard park market.

## NO FRAUD OR COLLUSION

33. None of the "red flags" that may hint at collusion in the settlement process are present here:

    a. No disproportionate cash award to Spohn's counsel coupled with a cosmetic non-cash recovery to the Real Parties;

    b. No "clear sailing" arrangement enabling payment to Spohn's counsel of an excessive fee in exchange for accepting an unfair settlement;

    c. No reversion of settlement money to Defendants.

## THE SETTLEMENT AND ATTEMPTS TO INVOLVE THE REAL PARTIES IN SAME

34. Following more than four years of litigation and lengthy in-person negotiations among the key players, in spring 2014 Spohn and Defendants reached a settlement in principle. Because none of the Real Parties intervened in the action – and understanding the *qui tam* nature of the claims – Spohn informed the Real Parties of the settlement and sought the government's approval of same. For more than six (6) months thereafter, Spohn attempted to negotiate with the government.

35. Receiving no concrete answers, and as the parties no longer wished to litigate the case, Spohn and Defendants moved forward negotiating the terms of a written agreement. After weeks of negotiating the terms – complicated in part because of the government's reluctance to take a position – and having

exchanged multiple drafts, the parties finalized the settlement agreement between Spohn (in its individual and representative capacity) and Defendants in late April 2015.

36. Upon formalizing and executing the written agreement, Spohn and Defendants again sought the approval of the Real Parties.

37. Over a six month period, Spohn continued its discussions with the governmental Real Parties. Spohn's counsel engaged with the Real Parties who indicated an interest through emails and conference calls.

38. Having reached an impasse, Spohn and Defendants jointly made a motion to have this Court approve a $150,000 settlement. Several Real Parties objected, and the Court denied the motion. The primary objection from the Real Parties was that the amount of potential damages described in the operative pleadings was too large compared to the settlement amount for the Real Parties to give up their rights in a settlement of the dispute.

39. As a result, counsel for Defendants and Spohn met and conferred with the DOJ and obtained its consent to the proposed agreement. Subsequently, over the course of several months, counsel for Defendants received the express approval of all Real Parties save Nevada. In that case, it is believed that there is no objection as the settlement agreement was provided, and several attempts at following up were made without any further response.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of March, 2018, in Los Angeles, California.

Jeffrey D. Dermer, Declarant

DECLARATION OF JEFFREY D. DERMER